# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JODI GONZALEZ**
        **Plaintiff,**

    **v.**                                                              **Case No. 14-C-533**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Jodi Gonzalez seeks judicial review of the denial of her application for social security disability benefits. For the reasons set forth below, I reverse the denial and remand for further proceedings.

## I. FACTS AND BACKGROUND

Plaintiff applied for benefits in February 2011, arguing that she could not work due to the disabling effects of depression, fibromyalgia, high blood pressure, scoliosis, degenerative disc disease, sleep apnea, obesity, and diabetes. (Tr. at 170-79, 199.) The Social Security Administration denied the application initially (Tr. at 84-85) and on reconsideration (Tr. at 86-87), so plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. at 129).

At the hearing, plaintiff testified that she was disabled due to pain in various parts of her body, including her back and legs, left hip, and knees. She also alleged numbness in her left hand related to an old injury. (Tr. at 54, 56, 63.) Pain medication helped somewhat (Tr. at 57, 65-66), but she nevertheless alleged significant limitations, requiring assistance from her children in completing household chores. (Tr. at 51, 57-58.) She also alleged disability due

to the effects of her depression, including fatigue, difficulty being around others, and angry outbursts. (Tr. at 60, 62, 66-67.)

On February 8, 2013, the ALJ issued an unfavorable decision. (Tr. at 14.) The ALJ found that plaintiff had not worked since September 4, 2010, the alleged disability onset date, and that she suffered from the severe impairments of fibromyalgia, scoliosis, degenerative disc disease, sleep apnea, diabetes, obesity, and depression. (Tr. at 19.) He found her hypertension and left hand/wrist injury non-severe. (Tr. at 20.) The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") for sedentary work, that was unskilled, involved one-two step tasks, with only occasional interaction with others, and allowed for a position change after sitting continuously for 45 minutes. (Tr. at 22.) In reaching this conclusion, the ALJ found plaintiff's statements regarding her limitations "not entirely credible." (Tr. at 23.) The ALJ also discounted the opinions of plaintiff's primary care physician, psychiatrist, and mental health counselor in favor of the opinions of a consultative examiner and the state agency medical and psychological consultants. (Tr. at 25-27.) Based on this RFC, and relying on the testimony of a vocational expert ("VE"), the ALJ found that plaintiff could perform jobs existing in significant numbers in the economy. (Tr. at 28-29.)

Plaintiff sought review by the Appeals Council (Tr. at 269), but on April 9, 2014, the Council denied her request (Tr. at 1). This action followed.

## II. DISCUSSION

Plaintiff argues that the ALJ erred in discounting the opinions of her treating providers, in evaluating the credibility of her statements, and in his consideration of the consultative examiner's report. I address each contention in turn.

2

## A. Treating Provider Opinions

### 1. Legal Standards

A treating doctor's medical opinion regarding the nature and severity of the claimant's impairment is entitled to "special significance" in determining RFC. SSR 96-8p, 1996 WL 374184, at *7. If the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply discard it; rather, he must determine what weight the opinion does deserve by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. Scrogham v. Colvin, 765 F.3d 685, 697 (7th Cir. 2014). The ALJ must always offer "good reasons" for discounting the opinion of a treating physician. Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011).

### 2. Analysis

#### a. Dr. Wille's April 26, 2010 Opinion

On April 26, 2010, Dr. Oscar Wille, a pain management specialist who saw plaintiff on referral from her primary care physician, Dr. Mark Lindstrom, prepared a report indicating, inter alia, that plaintiff would likely miss more than three days of work per month because of her impairments (Tr. at 303), and that she could participate in work/work readiness activities four to eight hour per day (Tr. at 304). The ALJ said nothing about Dr. Wille's report. See, e.g.,

3

Blom v. Barnhart, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) ("Given their prominence in social security proceedings, it is difficult to see how ignoring a treating source report can ever be reasonable."); see also Myles v. Astrue, 582 F.3d 672, 768 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'"). The omission is significant, as the VE testified that employers would not tolerate such absenteeism (Tr. at 76), and under social security regulations inability to sustain work on a "regular and continuing basis" (i.e., eight hours a day, for five days a week, or an equivalent work schedule) generally leads to a finding of disability. See Elder v. Astrue, 529 F.3d 408, 414 (7th Cir. 2008) (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96-8p, ability to work only part-time mandates disability finding)); SSR 96-8p, 1996 WL 374184, at *1 ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

The Commissioner responds that Dr. Wille offered no explanation for these limitations, and his opinion predates the disability onset date by nearly six months making it immaterial to the period under review in this case. However, the ALJ did not discount the opinion on these bases, and my review is limited to the reasons he supplied. See Hanson v. Colvin, 760 F.3d 759, 762 (7th Cir. 2014) (explaining that an ALJ's decision must be upheld, if at all, on the same basis articulated in the decision). Moreover, courts have rejected the notion that an ALJ may ignore record evidence simply because it predates the alleged onset date. See Doherty v. Astrue, No. 1:11-CV-00838, 2012 WL 4470264, at *5 (S.D. Ind. 2012) (collecting cases); Beth v. Astrue, 494 F. Supp. 2d 979, 1006-07 (E.D. Wis. 2007) (collecting cases). The matter must

4

be remanded for consideration of Dr. Wille's report.

### b. Dr. Lindstrom's Opinions

In his March 22, 2012, report, Dr. Lindstrom indicated, inter alia, that plaintiff would be off task more than 30% of a workday due to limitations in attention and concentration related to chronic pain and fatigue (Tr. at 642); that she would perform at less than 50% efficiency due to limited abilities to persist with tasks and maintain work pace (Tr. at 643); that she could sit for less than two hours and stand/walk about two hours in an eight hour workday; that she would need about five unscheduled breaks per workday (Tr. at 644); that she could frequently use her right hand but less than occasionally her left; that she had to avoid even minimal exposure to humidity extremes, solvents/cleaners, and perfumes, moderate exposure to cold, and concentrated exposure to heat; and that she would be absent from work more than four times per month due to "bad days" (Tr. at 645). The ALJ concluded:

> Dr. Lindstrom's opinion is not consistent with his conservative treatment history. In his treatment notes, he documented no significant findings or limitations regarding her physical or mental impairments. Additionally, there is no evidence to suggest the claimant required environmental limitations or limitations regarding her extremities. Thus, his opinion appears based on the claimant's subjective complaints and not on his examinations. Additionally, his opinion regarding her mental impairments is beyond his area of expertise. As a result, his opinions are given little weight.

(Tr. at 26.)

While it is proper for an ALJ to consider the opining doctor's own treatment notes, the regulations provide that a treating source report should be weighed based on its consistency with the "record as a whole." 20 C.F.R. Section 404.1527(c)(4). In this case, the ALJ overlooked Dr. Lindstrom's specific reliance on the examinations and treatment from plaintiff's pain management specialists. (Tr. at 611 – 3/22/12 note indicating: "I did review the pain

5

management notes and see what they have been seeing, what they have been following, what they are doing.") The pain management records indicate that plaintiff received injections, radio-frequency lumbar facet denervation, physical therapy, and medications for her back pain. (Tr. at 410, 413, 548-49, 552, 553-54, 654-55, 658-59, 660, 664, 667, 669-70, 844, 846, 849-50, 852-53, 855-56.) This treatment cannot be dismissed as conservative. See Cunningham v. Colvin, No. 14-C-420, 2014 WL 6634565, at *7 (E.D. Wis. Nov. 24, 2014) ("[P]laintiff received a wide array of treatments for her pain – including narcotic pain medication, epidural steroid injections, physical therapy, home-based exercises, and water aerobics – which cannot reasonably be characterized as conservative.").[1] The notes further record lumbar tenderness, reduced range of motion, and an antalgic gait (E.g., Tr. at 551, 843),[2] and MRI's revealed thoracic and lumbar disc protrusions/herniations (Tr. at 403-05, 642). Dr. Lindstrom thus had significant objective data, in addition to plaintiff's subjective pain complaints, upon which to base his opinions.

Dr. Lindstrom based the environmental limitations in part on concerns regarding skin irritation and allergic reactions, which also has support in the medical record. (E.g., Tr. at 463 – keratosis pilaris, perhaps aggravated by Lyrica; Tr. at 478 – itchy dry skin, lotions with fragrances make things work; 491 – itchy rash in left low back; see also Tr. at 432 – noting that

---

[1]The Commissioner notes that earlier in his decision the ALJ discussed plaintiff's treatment history. (Tr. at 22-24.) However, the ALJ did not link that discussion to his evaluation of Dr. Lindstrom's report. As indicated in the text, in discounting Dr. Lindstrom's report the ALJ specifically relied on the lack of support in Dr. Lindstrom's treatment notes.

[2]Based on his own exams, Dr. Lindstrom diagnosed low back pain, ongoing chronic, with underlying fibromyaliga, referring her to pain management. (Tr. at 316.)

6

plaintiff is very sensitive to side effects of medication.)[3]  Finally, while the evidence regarding plaintiff's left arm problems may be underwhelming, the record does reflect surgeries in 1985 and 1992 (Tr. at 289) with continued pain and swelling noted in a 2008 consultative examination (Tr. at 281-82), and plaintiff testified to ongoing problems at the hearing (Tr. at 63). The case must also be remanded for reconsideration of Dr. Lindstrom's opinion.[4]

### c.   Therapist Houghton's Reports

Plaintiff received mental health therapy from Lindsey Houghton, MS, and Houghton prepared two reports regarding plaintiff's functioning.  In her February 27, 2012 report, Houghton opined that, inter alia, plaintiff would be absent more than four days per month because of bad days due to impairments or the need for treatment; she would be prevented from independently leaving her home due to panic/anxiety attacks once or twice per month; and that she would need three or more unscheduled breaks per day due to psychological symptoms such as intrusive or racing thoughts, irritability, fatigue, and need to isolate. (Tr. at 593.)  In a March 7, 2012 report, Houghton indicated that plaintiff constantly experienced symptoms that would interfere with the attention and concentration needed to perform even simple work tasks; that plaintiff's impairments would become acute so that she would be absent from work more than three times per month (Tr. at 598); and that plaintiff had poor or no ability to interact appropriately with the general public, maintain attention for a two-hour segment,

---

[3] At the hearing, plaintiff testified to allergic reactions and other medication side effects. (Tr. at 64, 65.)

[4] On remand, the ALJ must reconsider any possible limitations in plaintiff's use of the left upper extremity.  The ALJ found plaintiff's left hand and wrist problems non-severe, but in determining RFC the ALJ "must account for all impairments, even those that are not severe in isolation."  Murphy v. Colvin, 759 F.3d 811, 820 (7th Cir. 2014).

7

work with others, complete a normal workday without interruptions from psychologically based symptoms, perform at a consistent pace, accept instruction, get along with co-workers, respond to changes and handle stress (Tr. at 599). The ALJ gave these reports little weight because Houghton had treated plaintiff for just two months at the time she prepared them; Houghton attributed plaintiff's limitations in daily activities to pain rather than depression; Houghton indicated that plaintiff was able to concentrate on conversations during counseling sessions; Houghton attributed some of plaintiff's anticipated absences to the need to attend therapy, not "bad days" alone; and the reports were "not consistent with the overall record" and the "evidence as a whole." (Tr. at 25.)

The regulations provide that length of the treatment relationship is a proper consideration.[5] The ALJ also correctly noted that Houghton attributed plaintiff's absences to the need to attend therapy and psychiatric sessions, rather than "bad days." (Tr. at 593.) The remaining reasons the ALJ gave are dubious. In the February 27 report, Houghton wrote that plaintiff's "chronic pain impedes her ability to perform daily tasks." (Tr. at 595.) However, the many other limitations she endorsed were based on plaintiff's mental impairment. Further, the ALJ failed to explain how plaintiff's ability to concentrate on conversation in a therapy session (Tr. at 595) would translate into the ability to maintain the attention, concentration, and emotional stability needed to sustain full-time work. See 20 C.F.R. § 404, Subpart P, App. 1, § 12.00(C)(3) (noting that the ALJ must exercise great care in reaching a conclusion about the

---

[5]The ALJ's reliance on that factor here could be questioned given his decision to give great weight to the report of a consultative examiner who saw plaintiff just once. Further, as Houghton noted, while she had been seeing plaintiff for about two months at the time she prepared the reports, plaintiff had been receiving therapy at that location for more than a year. (Tr. at 596.) Presumably, those treatment records were available to Houghton at the time she prepared her reports.

8

claimant's ability to complete tasks under the stresses of employment based on the ability to complete tasks in less demanding settings, such as examination by a clinician). Finally, the ALJ failed to specify how Houghton's opinions were inconsistent with the record as a whole. See Boiles v. Barnhart, 395 F.3d 421, 426 (7th Cir. 2005) (vacating where the ALJ did not explain how other evidence in the record contradicted doctor's opinion).[6] While these problems with the ALJ's evaluation of Houghton's reports, standing alone, might not warrant remand, because the case must be returned for other reasons the ALJ should also reconsider Houghton's reports.

### d. Dr. Mullooly's Opinions

In an August 10, 2012 report, plaintiff's treating psychiatrist, Dr. JP Mullooly, opined that plaintiff's fatigue would cause her to be tardy, leave work early, or leave the work station five or more days per month; that problems relating to others, including verbal outbursts of anger and withdrawal from tasks, would occur once per week (Tr. at 723); that she would miss work more than four days per month due to bad days and need for treatment; that she would need more than three unscheduled breaks per work day due to her symptoms (Tr. at 724); and that her tolerance for work stress would be impacted by emotional arousal, with her anger escalating quickly (Tr. at 725). The ALJ stated that Dr. Mullooly attributed these limitations primarily to pain, not an area of his expertise. "While his opinion is given some weight, the evidence does not support his opinion regarding the time she would not be able to perform work activity." (Tr. at 26.)

---

[6] Houghton is not an "acceptable medical source" whose opinion may receive controlling weight, but opinions from other sources such as therapists are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3.

9

Dr. Mullooly attributed plaintiff's absences to pain and sleep problems (Tr. at 724); he also wrote, regarding the paragraph B criteria of the mental impairment Listings, "pain limits much of [the] above." (Tr. at 726.) However, he specifically attributed plaintiff's need for extra breaks to intrusive thoughts, racing thoughts, irritability, fatigue, and need to isolate, not to pain. (Tr. at 724.) He also opined that plaintiff could not tolerate work stress on a consistent basis due to quickly escalating anger. (Tr. at 725.) The VE testified that employers would not tolerate unscheduled breaks or angry outbursts. (Tr. at 79.) The ALJ must reconsider these portions of Dr. Mullooly's report on remand.[7] See Myles, 582 F.3d at 678 ("It is not enough for the ALJ to address mere portions of a doctor's report."); see also SSR 96-5p, 1996 WL 374183, at *4 ("Adjudicators must remember . . . that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, . . . and that it may be necessary to decide whether to adopt or not adopt each one."). The ALJ must in reconsidering RFC on remand specifically account for plaintiff's propensity for "angry outbursts," as well as her marked limitations in dealing with the public.[8] (Tr. at 575.)

## B. Credibility

### 1. Legal Standards

In evaluating the credibility of a claimant's statements about her symptoms and limitations, the ALJ must first determine whether the claimant suffers from a medically

---

[7] The Commissioner argues that Dr. Mullooly does not qualify as a treating source because he had only seen plaintiff a handful of times when he prepared the report. The argument is post hoc and must be disregarded.

[8] The Commissioner contends that the ALJ accounted for these issues by limiting plaintiff to occasional interaction with others. However, the record suggests that plaintiff's outbursts may not be related to the frequency of her contacts with others, an issue the ALJ must address on remand.

10

determinable physical or mental impairment that could reasonably be expected to produce the symptoms. SSR 96-7p, 1996 WL 374186, at *2. If the claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the symptoms, the symptoms cannot be found to affect her ability to work. Id. If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to relieve the symptoms. Id. at *2-3. The ALJ may not reject the claimant's statements based solely on a lack of objective medical support. See, e.g., Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

The reviewing court will give "an ALJ's credibility determination special, but not unlimited, deference." Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012). The ALJ must consider the pertinent regulatory factors and then provide specific reasons for his credibility determination, supported by the evidence in the case record and articulated in the decision. See SSR 96-7p, 1996 WL 374186, at *4; Shauger, 675 F.3d at 696. The court need not defer to a determination based on a misunderstanding or one-sided view of the evidence. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004).

11

## 2. Analysis

The ALJ found that while plaintiff's impairments could reasonably be expected to cause the symptoms alleged, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. at 23.) The ALJ offered five reasons for this conclusion.

First, the ALJ indicated that plaintiff's allegations of disabling back pain were not supported by the clinical findings; imaging reports and examinations showed minimal findings, only slightly decreased range of motion, and ability to ambulate without an assistive device. (Tr. at 27.) The medical evidence does not fully support the ALJ's characterization. The April 14, 2011 MRI of plaintiff's lumbar spine revealed a left foraminal disc herniation at L4-5, with mild to moderate narrowing of the left neural foramen at this level, and mild multi-level degenerative changes. (Tr. at 404-05.) See Roddy v. Astrue, 705 F.3d 631, 637 (7th Cir. 2013) ("The ALJ misunderstood or mischaracterized the results of the MRI. Rather being unremarkable, those results demonstrated mild to moderate degeneration in one of the discs of Roddy's lower spine as well as a tear in the cartilage surrounding that disc."). At times, plaintiff's lumbar range of motion was moderately reduced (E.g., Tr. at 843), and while she did not need a cane she did at times demonstrate an antalgic gait (E.g., Tr. at 658).

Second, the ALJ stated that plaintiff's "activities of daily living suggest she is capable of performing work at the sedentary level." (Tr. at 27.) Although it is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility, "this must be done with care." Roddy, 705 F.3d at 639. A person's ability to perform daily activities, especially if that can be done only with significant limitations or with assistance from others, does not necessarily translate into an ability to work full-time. Id.; Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir.

12

2012). Here, the ALJ noted plaintiff's reports to providers that she was able to walk her dog, swim, and babysit for her granddaughter. The record offers scant support for these observations. At the hearing and in her pre-hearing function report, plaintiff stated that her children walked the dogs; she just let them out in the yard. (Tr. at 52, 213; see also Tr. at 733 – plaintiff reported walking her dog, who is blind, to the front yard.) At the hearing, plaintiff testified that in the summer of 2012 she took her kids swimming at the lake, but she did not swim. (Tr. at 59; see also Tr. at 740 – plaintiff reported to Houghton taking her sons swimming, showing a video of them jumping off the pier; Tr. at 742 – plaintiff shared that she had been going to the pier with her sons and enjoyed watching them swim.) Plaintiff testified that in the summer of 2011 she went to a pool to "just float around and wade in the water." (Tr. at 68.) Plaintiff testified that she babysat one of her grandchildren while her daughter worked, but the child mostly slept while in plaintiff's care. (Tr. at 54; see also Tr. at 751 – plaintiff advised Houghton that she babysat her granddaughter while her daughter worked, but she refused to do so at other times.) The ALJ also failed to explain how any of these activities undercut plaintiff's testimony regarding her limitations. See, e.g., Shafer v. Colvin, No. 13-C-0929, 2014 WL 1785343, at *11 (E.D. Wis. May 5, 2014) (reversing credibility determination where the ALJ simply provided a list of activities, without linking them to any of the claimant's alleged restrictions); see also Gentle v. Barnhart, 430 F.3d 865, 867-68 (7th Cir. 2005) ("[T]aking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not. You can park the infant in a playpen for much of the day, and anyway it will sleep much of the day . . ., and so the caretaker will have numerous breaks in which to rest.").[9]

---

[9]The ALJ also cited plaintiff's report to Houghton that she would have gotten into a physical altercation with another woman had her son and husband not intervened. (Tr. at 27,

13

Third, the ALJ noted that mental status exams consistently reported normal behavior. (Tr. at 27.) This is an overstatement. At times, she presented "relatively well," with a "pretty normal mental status exam." (E.g., Tr. at 428, 563, 570, 696, 702.) At other times, she displayed homicidal and/or suicidal ideation (Tr. at 711, 717, 719, 753), tangential thoughts (Tr. at 713, 715, 720), rapid speech (Tr. at 720), and racing thoughts (Tr. at 721).

Fourth, the ALJ stated that while plaintiff reported that her medication helped with her mood and ability to be around others, she admitted that she had been non-compliant with taking it as directed. (Tr. at 27.) In support of this finding, the ALJ cited exhibit 32, which contains 50 pages of medical records, without a pinpoint, but he was likely referring to an October 12, 2011, note from Dr. Vance Baker, plaintiff's then-treating psychiatrist, in which plaintiff admitted not taking her Zoloft regularly. Plaintiff and Dr. Baker worked out a new system to make sure she remembered to take her pills (Tr. at 702), and when plaintiff returned on December 21, 2011, Dr. Baker noted that she had done much better taking her Zoloft after putting an alarm on her phone to remind her (Tr. at 706). Non-compliance with recommended treatment can diminish a claimant's credibility, but the ALJ must consider any reasons why the claimant failed to fully comply. Murphy v. Colvin, 759 F.3d 811, 816 (7th Cir. 2014). In this case, the ALJ failed to explain why plaintiff's temporary non-compliance due to forgetfulness impacted her credibility. See also Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011) (noting that mental patients are often incapable of taking their prescribed medications consistently);

731.) At the hearing, plaintiff testified that the other person antagonized her, calling her "all sorts of lovely names," and in that particular situation her anger trumped the pain. (Tr. at 71-72.) Houghton's notes suggest that this was an instance in which plaintiff lost control due to anger. (Tr. at 731 – "Client was intent on conveying how angry she had been, and that she could not do anything about her anger.") The ALJ failed to explain how this one incident undermined plaintiff's claims of debilitating pain.

14

Spiva v. Astrue, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness – the difficulty of keeping patients on their medications."). The ALJ also failed to consider the evidence of medication side effects, noted by Dr. Baker and others. (E.g., Tr. at 706 – "Her medication history describes that she has trouble with almost everything and we're just grateful she can take some Zoloft and her depression is better.")

Finally, the ALJ noted that the consultative examiner, Dr. Calvin Langmade, reported that plaintiff would be capable of work with treatment, and that her personality test had "questionable validity due to excessive negative response bias." (Tr. at 27.) The latter statement is taken out of context. Dr. Langmade administered the Minnesota Multiphasic Personality Inventory ("MMPI"), noting:

> The current [MMPI] profile is questionable for validity due to Ms. Gonzalez's excessive negative response bias in reporting symptoms. Though her profile does not suggest that she was malingering (faking/feigning) her report of symptoms, it does suggest that she is reporting a high level of negative symptoms for the likely reason of seeking help. In fact, her response bias is clinically known as a "cry for help" profile. The result of this bias is to inflate the level of severity of symptoms with the intent to gain help/treatment.

(Tr. at 373.)

The Commissioner agrees that Dr. Langmade did not find plaintiff to be malingering but contends that the ALJ reached no such conclusion; he merely pointed out the doctor's finding of questionable test validity. However, the Commissioner offers no explanation as to why the ALJ would cite this finding if not to suggest that plaintiff was exaggerating the severity of her symptoms.[10]

---

[10] I address in the next section of this opinion the ALJ's reliance on Dr. Langmade's conclusion that plaintiff likely could work if she received treatment.

15

Given the significant problems with the ALJ's credibility rationale, outlined above, the matter must also be remanded for reconsideration of plaintiff's testimony and statements.

## C.     Dr. Langmade's Opinion

Following his November 2010 independent psychological evaluation, Dr. Langmade diagnosed plaintiff with major depressive disorder, recurrent, moderate severity, and pain disorder associated with psychological factors. (Tr. at 374.) He concluded that "in her current emotional state [plaintiff] would not be able to consistently perform the duties of any occupation for which she is qualified." (Tr. at 375.) He noted that if she were willing to pursue mental health services, which she was not then receiving, then her prognosis was good; if not, then she was likely to maintain her situation of unemployment and unsatisfying personal relationships. (Tr. at 375.) He stated that given her current psychological condition, she did not have the emotional strength to tolerate the routine stress of working daily and functioning on a personal level. She would likely become overwhelmed and fail to follow through with plans to return to work. However, if she received mental health treatment then she likely could work without any restrictions or limitations. He anticipated that treatment would require at least one year before seeing maximum benefit. (Tr. at 376.)

The ALJ discussed Dr. Langmade's report, including his opinion that, in her "current state, she would not be able to consistently perform the duties related to any occupation and she could not tolerate the routine stressors of working daily without treatment." (Tr. at 25.) The ALJ then found Dr. Langmade's opinion "consistent with the record as a whole" and gave it "great weight." (Tr. at 25.) However, the ALJ failed to explain how his acceptance of this report squared with his conclusion that plaintiff had not been under a disability at any time from September 4, 2010, through the date of decision. (Tr. at 29.) Even assuming, arguendo, that

16

the mental health treatment plaintiff began receiving in February 2011 restored her ability to work, the ALJ did not consider whether Dr. Langmade's opinion that plaintiff was disabled in November 2010 – and would need a year of treatment to get better – supported at least a closed period of disability.[11]

The Commissioner notes that the ultimate determination of disability is a legal matter reserved to the agency, and that the ALJ need not defer to a doctor's conclusion that a claimant is disabled or unable to work. The Commissioner contends that the opinion to which the ALJ gave great weight consisted of Dr. Langmade's objective observations on mental status examinations, not his conclusion on ability to work. The ALJ did not parse the opinion in the manner the Commissioner suggests, and my review is limited to the reasons set forth in the ALJ's decision. Hanson, 760 F.3d at 762. Moreover, if the ALJ had read the opinion as the Commissioner suggests, he would have erred. See Garcia v. Colvin, 741 F.3d 758, 760 (7th Cir. 2013) (holding that ALJ may not ignore opinions on issues reserved to the Commissioner). Finally, Dr. Langmade offered more than a bald conclusion that plaintiff could not work; he specifically found that she did not have the emotional strength to tolerate routine work stress and function on a personal level. The matter must be remanded so the ALJ can clarify his reliance on Dr. Langmade's report.

### III.  CONCLUSION

Plaintiff asks for reversal and an award of benefits, but that remedy is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports but one conclusion – that the claimant qualifies for disability benefits.

---

[11]As discussed above, plaintiff's treatment providers did not believe that her ability to work had been restored.

17

Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). As discussed above, the record contains conflicting evidence the ALJ must sort out on remand.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this opinion pursuant to 42 U.S.C. § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of January, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge